**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

MARY STAPLES and KATHY
WALKER-BROWN,

       Plaintiffs,

vs.

DELAVAN INC. and GREG ALLEN,

       Defendants.

No. C 07-3019-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING DEFENDANT
DELAVAN INC.'S MOTION FOR
SUMMARY JUDGMENT**

_____

**TABLE OF CONTENTS**

**I. INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   **A. Procedural Background** . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   **B. Undisputed Factual Background** . . . . . . . . . . . . . . . . . . . . 5

**II. LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   **A. Standards for Summary Judgment** . . . . . . . . . . . . . . . . . . . 8
   **B. Plaintiffs' Motion to Strike** . . . . . . . . . . . . . . . . . . . . . . . 15
   **C. Sexual Discrimination** . . . . . . . . . . . . . . . . . . . . . . . . . . 18
      **1. Arguments of the parties** . . . . . . . . . . . . . . . . . . . . . 18
         **a. The Employer's initial arguments** . . . . . . . . . . . . 18
         **b. The plaintiffs' response** . . . . . . . . . . . . . . . . . . . 19
         **c. The Employer's reply** . . . . . . . . . . . . . . . . . . . . 19
      **2. Analysis of the Sexual Discrimination Claim** . . . . . . . . . . 19
         **a. The plaintiffs' prima facie case** . . . . . . . . . . . . . . . 20
            **i. The plaintiffs' ability to meet the Employer's
                legitimate job expectations** . . . . . . . . . . . . . . 20
            **ii. Whether similarly situated employees were
                 treated differently** . . . . . . . . . . . . . . . . . . . . 21

        *b.*     *The Employer's asserted legitimate, nondiscriminatory rationale* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        *c.*     *Pretext and discriminatory animus* . . . . . . . . . . . . . 25

            *i.*     *Staples's suspension and termination* . . . . . . . 25

            *ii.*    *Walker-Brown's suspension* . . . . . . . . . . . . . 27

**D. Sexual Harassment** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    *1.*     *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . 29

        *a.*     *The Employer's initial arguments* . . . . . . . . . . . . . 29

        *b.*     *The plaintiffs' response* . . . . . . . . . . . . . . . . . . . 29

        *c.*     *The Employer's reply* . . . . . . . . . . . . . . . . . . . . . 29

    *2.*     *Hostile Environment Analysis* . . . . . . . . . . . . . . . . . 30

        *a.*     *Elements of the claim* . . . . . . . . . . . . . . . . . . . . 30

            *i.*     *The "Unwelcomeness" of the Employer's conduct* . . . . . . . . . . . . . . . . . . . . . . . . . . 32

            *ii.*    *Harassment based on gender* . . . . . . . . . . . . . 34

            *iii.*   *Harassment affecting a term, condition, or privilege of employment* . . . . . . . . . . . . . . . . 36

            *iv.*   *The Employer's knowledge and remedial actions* . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**E. Walker-Brown's Constructive Discharge** . . . . . . . . . . . . . . . . . . . 47

**F. Retaliation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    *1.*     *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . 48

        *a.*     *The Employer's initial argument* . . . . . . . . . . . . . 48

        *b.*     *The plaintiffs' response* . . . . . . . . . . . . . . . . . . . 49

        *c.*     *The Employer's reply* . . . . . . . . . . . . . . . . . . . . . 49

    *2.*     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

            *i.*     *Staples's retaliation claim* . . . . . . . . . . . . . . . 51

            *ii.*    *Walker-Brown's retaliation claim* . . . . . . . . . . 53

***III. CONCLUSION*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Two former employees of a manufacturing company allege that their employer subjected them to sexual discrimination, sexual harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Iowa Civil Rights Act, Iowa Code Chapter 216. The employer admits that sexual innuendo was present in employee discussions during breaks—the plaintiffs claim that their supervisor literally plugged his ears and looked away when the conversations were occurring. The employer alleges that the female plaintiffs took part in the conversations. However, the plaintiffs claim that they were subjected to more severe verbal and physical harassment outside of the conversations. The court must, in deciding whether to grant this motion for summary judgment, determine whether a jury should hear all of the plaintiffs' allegations or whether the court should figuratively plug the jurors' ears as to one or all of the claims.

## I. INTRODUCTION

### A. Procedural Background

On March 15, 2007, plaintiffs Mary Pat Staples and Kathy Walker-Brown filed their Complaint and Jury Demand in this court against Goodrich Corporation d/b/a Goodrich Turbine Fuel Technologies Inc., Jeff Shedd and Greg Allen. Doc. No. 2-1. On May 8, 2007, plaintiffs filed their Amended and Substituted Complaint and Jury Demand substituting Delavan, Inc. (the Employer) as a defendant in place of Goodrich Corporation d/b/a Goodrich Turbine Fuel. Doc. No. 13. In Count I of plaintiffs' complaint, they allege that the defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, with respect to the terms and conditions of the plaintiffs' employment on the basis of their sex—by subjecting them to sexual harassment, a hostile work environment, and retaliating against them for complaints and opposition to the

discrimination—constructively discharging Brown and terminating Staples. In Count II, the plaintiffs allege that the defendants violated the Iowa Civil Rights Act, Iowa Code Chapter 216, by discriminating against the plaintiffs with respect to the terms and conditions of their employment on the basis of their sex—subjecting them to sexual harassment, a hostile work environment, and retaliating against them for complaints and opposition to the discrimination—constructively discharging Walker-Brown and terminating Staples's employment. In Count III, the plaintiffs allege that defendant Greg Allen committed assault and battery on plaintiff Staples by making insulting, offensive or painful bodily contact with her, without her consent, and by putting her in apprehension of additional physical contact. The court granted plaintiffs' motion to dismiss Jeff Shedd on May 23, 2008 (see Doc. No. 34), dismissing defendant Shedd from the case without prejudice. Doc. No. 35.

On August 4, 2008, the defendant Employer filed its Motion for Summary Judgment, which is now before the court. In its motion, the Employer first asserts that it is entitled to summary judgment because the plaintiffs cannot prove the third element of their prima facie case for gender discrimination—the Employer alleges that they were not meeting its legitimate expectations for workplace conduct. The Employer also claims, in the event that the court finds that the plaintiffs have proven a prima facie case of discrimination, that it had a legitimate, nondiscriminatory reason for its disciplinary actions in relation to the plaintiffs. Second, the Employer claims that summary judgment should be granted on plaintiffs' hostile work environment claim because they cannot generate a genuine issue of material fact concerning whether the alleged acts were unwelcome, affected a term, condition, or privilege of employment, and were causally connected to their gender. In addition, the Employer claims that it took prompt remedial action once it was aware of the plaintiffs' allegations. Third, the Employer claims that it is entitled to

summary judgment on plaintiffs' retaliation claim because they are unable to establish a causal connection between their protected activity and the adverse employment action. Plaintiffs responded in a timely manner to the Employer's motion (Doc. No. 50), and the Employer filed a timely reply. Doc. No. 53. Plaintiffs also filed their Motion to Strike Paragraphs 33-37 of Defendant's Statement of Facts for Violation of IA Code § 668.15. Doc. No. 48. The Employer filed a timely response to the motion to strike. Doc. No. 56.

On December 2, 2008, the court heard telephonic oral arguments. Tracy Van Steenburgh, of Halleland, Lewis, Nilan & Johnson, P.A. in Minneapolis, Minnesota represented the Employer. Beth Townsend, of Townsend Law Office, P.L.C. in West Des Moines, Iowa represented the plaintiffs. Pro se defendant Greg Allen did not take part in the telephonic hearing. Although the lawyers persisted through recurring phone problems during the telephonic hearing, the court found that the arguments presented succinctly summarized the parties' respective postures on each of the contested issues. The Employer's motion for summary judgment is now fully submitted.

## B. Undisputed Factual Background

The parties' statement of facts reveals that the summary judgment record contains relatively few undisputed facts. The Employer has a facility that produces gas turbine fuel injection components located in Carroll, Iowa. The Employer has a Business Code of Conduct covering this facility, which explains that individuals needing "assistance with ethics or compliance matters[,] and to report potential non-compliance, should first discuss the issue with their immediate supervisor or manager" and that:

> If your immediate supervisor is unable to resolve the issue—
> or if you are uncomfortable discussing the issue with your
> immediate supervisor—you should seek assistance from other
> channels. These include: the next higher level of leadership;

Human Resources; the designated Ethics and Business Conduct
Office; Legal department; or the Goodrich HelpLine.

A.5.

Both plaintiff Staples and plaintiff Walker-Brown worked at the Employer's Carroll facility. Plaintiff Staples worked at the facility for approximately five months in 2000 and/or 2001. The Employer rehired Staples in September of 2003 and she worked there until August of 2006, when she was terminated. During this second period of employment, in approximately November of 2005, Staples complained to Eric Boell, Staples's supervisor, that employee Greg Allen was shoving her with his belly and pushing her with his arm. Allen claimed that he only put his hand on Staples's shoulder. In response to the complaint, Boell verbally warned Allen that the behavior was inappropriate—Allen did not have any warnings in his file at the time he received this verbal warning. Boell also held a meeting in response to Staples's complaints regarding Allen, where Boell went over the company policy of no touching, no dirty jokes, and no sexual comments. Later that month, the Employer disciplined Staples.

In addition to the above account of the November 2005 events, the parties' undisputed facts include other alleged incidents of inappropriate behavior involving Allen and Staples. These allegations include: that Allen told Staples to "drop a part;" that Allen bumped into her; that Allen put her in a headlock and told her that she was at "about the right height;" that Allen grabbed her by the back of the neck; that Allen put his arm around her neck; that Allen unzipped her shirt; and that Allen told her that he "liked her on her knees." Staples also claims that Allen communicated Staples's personal information at the work place—Staples filed a formal complaint for being docked hours and claimed that her new supervisor, Roy Alford, disclosed the information in front of Allen.

In April of 2006, Staples was suspended with a final warning. She then took stress-related medical leave beginning May 9, 2006, and she filed a complaint with the Iowa Civil Rights Commission on June 6, 2006. Staples returned to work on July 4, 2006, was suspended on July 20, 2006, for allegedly threatening a co-worker, and was eventually terminated. Staples would not have been terminated because of the alleged threats in and of themselves.

The Employer hired the other plaintiff, Walker-Brown, to work at the Carroll facility approximately March 7, 2005. On February 20, 2006, Walker-Brown received documentation of a verbal warning for exceeding her unpaid leave allowance for the first quarter of 2006 by 18 hours.

Some of Walker-Brown's allegations of harassment are also included in the parties' undisputed facts. Walker-Brown alleges that co-worker Jeff Shedd made the following statements to her over an approximately six month period: that he wished he had met her before he met his wife; that she only needed to identify a "time and place;" that he wanted to "fuck her brains out;" and that he wanted to see Walker-Brown's breasts. Walker-Brown also alleged that on one occasion Shedd cornered her in a supply room and touched her breasts and her crotch. Connie Pudenz testified that Shedd was ultimately fired for conduct "outside of the workplace." B.88, pg 113.

Walker-Brown also claims that she reported Greg Allen, a lead man, for harassing her when he asked her what bra size she wore, and on a separate occasion, put his hands around her neck. Walker-Brown claims that she reported the incident to Boell on the night that it happened, but Boell did not remember a report.

On March 20, 2006, Walker-Brown went on medical leave. She had obtained a letter from Dr. Nabil Khoury, from the Family Medical Speciality Center in Carroll, Iowa

stating that:

> My patient Kathy Walker[-Brown] has undergone a psychological trauma and she is having Post-traumatic disorder. I believe it will be beneficial for her to stay away from work for 4 weeks. I would appreciate accommodating her.

B.1. Walker-Brown later filed a complaint with the Iowa Civil Rights Commission, dated June 14, 2006, and then returned to work on July 6, 2006. However, shortly after she returned, the Employer suspended Walker-Brown—Walker-Brown's employment was not terminated and she was eligible to return, but Walker-Brown never returned to work.

## II. LEGAL ANALYSIS

### A. Standards for Summary Judgment

Motions for summary judgment essentially "define disputed facts and issues and… dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1982 (2007); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses…."). Any party may move for summary judgment regarding "all or any part" of the claims asserted in a case. Fed R. Civ. P. 56(a), (b) (allowing a claimant to move for summary judgment "at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party," and allowing a defending party to move for summary judgment "at any time"). Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no *genuine* issue of *material* fact and that the moving party is entitled to a judgment as a matter of law." *Id.* 56(c) (emphasis added); *see Woods*

*v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is *material* when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.* An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence"). Evidence presented by the nonmoving party that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, such as a "scintilla of evidence," *Anderson*, 477 U.S. at 252; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997), or evidence that is "merely colorable" or "not significantly probative," *Anderson* at 249-50, does not make an issue of material fact genuine.

Thus, a *genuine issue of material fact* is not the "mere existence of some alleged factual dispute between the parties." *State Auto. Ins. Co. v. Lawrence*, 358 F.3d 982, 985 (8th Cir. 2004). "'Instead, "the dispute must be outcome determinative under prevailing law."'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910-11 (8th Cir. 2005) (quoting *Get*

*Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992), in turn quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). In other words, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. Essentially, a genuine issue of material fact determination, and thus the availability of summary judgment, is a determination of "whether a proper jury question [is] presented." *Id.* at 249. A proper jury question is present if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

Procedurally, the moving party does not have to "support its motion with affidavits or other similar materials *negating* the opponent's claim," *Celotex*, 477 U.S. at 323, but the moving party does bear "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Thus, a movant need only demonstrate the absence of a genuine issue of material fact and that it is entitled to judgment according to law. *See Celotex*, 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Mosley*, 415 F.3d at 910 ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))). Thus, the movant must show the

absence of a genuine issue of material fact as it relates to the substantive law, and the nonmovant must show the alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 322; *In re Temporomandibular Joint*, 113 F.3d at 1492.

In considering whether a genuine issue of material fact is present the court must view all the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88; *Mosley*, 415 F.3d at 910. Further, the court must give such party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita*, 475 U.S. at 587-88. However, "because we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather than "attempt[ing] to determine the truth of the matter… the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

Of course, the facts are not the sole concern of the court; after all, a genuine issue of material fact necessarily depends on the substantive law. *See Holloway*, 884 F.2d at 366 ("The presence of a genuine issue of fact is predicated on the existence of a legal theory which can be considered viable under the nonmoving party's version of the facts. The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law."). Moreover, summary judgement is particularly appropriate "where the unresolved issues are primarily legal rather than factual." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996). But even if no genuine issue of material fact is present in a case,

summary judgment is not appropriate unless the governing law supports the moving party's position. Fed. R. Civ. P. 56(c) (requiring the moving party to also show that it "is entitled to judgment as a matter of law"). Furthermore, "the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson*, 477 U.S. at 252; *see Brandon v. Lotter*, 157 F.3d 537, 539 (8th Cir. 1998) ("'In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law.'" (quoting *Hartnagel*, 953 F.2d at 396)). Therefore, the court will first address the evidentiary standards of proof involved in these claims of employment discrimination, and then address the Employer's motion for summary judgment in light of the applicable standards and the factual issues presented by the parties.

Before doing so, however, the court recognizes "that summary judgment is disfavored in employment discrimination cases." *Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir. 2005); *see Woods v. Perry*, 375 F.3d 671, 674 (8th Cir. 2004) ("[S]ummary judgment should be used sparingly in employment discrimination cases...."); *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994) ("[S]ummary judgment should seldom be used in employment discrimination cases."). This exceptional deference shown the nonmoving party is warranted, according to the Eighth Circuit Court of Appeals, "[b]ecause discrimination cases often turn on inferences rather than on direct evidence...," *E.E.O.C. v. Woodbridge Corp.*, 263 F.3d 812, 814 (8th Cir. 2001) (*en banc*) (citing *Crawford*, 37 F.3d at 1341; *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999)), and because "intent" is generally a central issue in employment discrimination cases. *Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1071 (8th Cir. 1998) (citing *Gill v. Reorganized Sch. Dist. R-6, Festus, Mo.*, 32 F.3d 376, 378 (8th Cir. 1994)); *see Simpson*,

425 F.3d at 542 (noting summary judgment is disfavored in employment discrimination cases because they are "'inherently fact-based.'" (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 806 (8th Cir. 2003))). Nonetheless, this exercise of judicial prudence "cannot and should not be construed to exempt" from summary judgment, employment discrimination cases involving intent. *Christopher*, 137 F.3d at 1071 (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 959 (8th Cir. 1995)). The fact remains that "'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The court will apply these standards to the defendants' Motion for Summary Judgment.

However, the court must first observe that stating the legal principles of summary judgment in employment discrimination cases is a simple task. Applying those principles to the paper record that forms the judicial crucible that decides which plaintiffs may proceed to trial and which get dismissed is far more daunting. Missing in the standard incantation of summary judgment principles is the role of experience. Justice Oliver Wendell Holmes wrote, "The life of the law has not been logic; it has been experience." OLIVER WENDELL HOLMES, THE COMMON LAW 1 (1881). Thus, experience teaches that thoughtful deliberation of summary judgment in employment discrimination cases is grounded in the consideration of each case through a lens filtered by the following observations. Employment discrimination and retaliation, except in the rarest cases, is difficult to prove. It is perhaps more difficult to prove today—more than forty years after the passage of Title VII which, along with the Iowa Civil Rights Act (ICRA), is at issue here—than during Title VII's earlier evolution. Today's employers, even those with only a scintilla of sophistication, will neither admit discriminatory or retaliatory intent, nor

leave a well-developed trail demonstrating it. *See, e.g., Riordan v. Kempiners*, 831 F.2d 690, 697-98 (7th Cir. 1987). Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge. This is especially true, because the very best workers are seldom employment discrimination plaintiffs due to sheer economics: Because the economic costs to the employer for discrimination are proportional to the caliber of the employee, discrimination against the best employees is the least cost effective. *See, e.g., id.* Rather, discrimination plaintiffs tend to be those average or below-average workers—equally protected by Title VII and the ICRA—for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. *See, e.g., id.* Consequently, with both the legal standards for summary judgment and the teachings of experience in hand, the court will resolve plaintiffs' motion to strike and then turn to consideration of the parties' arguments for and against summary judgment.[1]

---

[1] The plaintiffs' Title VII and ICRA claims are determined according to essentially the same standards. *See Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999) ("The ICRA was modeled after Title VII of the United States Civil Rights Act. Iowa courts therefore traditionally turn to federal law for guidance in evaluating the ICRA," employing "the analytical framework utilized by the federal courts in assessing federal law," although federal law is not controlling). Therefore, the court will not analyze separately the state and federal claims of sexual harassment, sexual discrimination, and retaliation, unless a difference between state and federal law becomes relevant to the disposition of the defendants' motion for summary judgment.

### *B. Plaintiffs' Motion to Strike*

On September 25, 2008, the plaintiffs filed their Motion to Strike Paragraphs 33-37 of Defendant's Statement of Facts for Violation of Iowa Code § 668.15. Doc. No. 48. The plaintiffs rely on Iowa Code § 668.15 and Federal Rule of Evidence 412 in arguing that paragraphs 33 through 37 of the Employer's statement of facts should be stricken from the record for improperly making allegations about Walker-Brown's sexual history and conduct. The facts asserted by the Employer in the disputed paragraphs include the following: that Walker-Brown accused Shedd of misconduct because she was upset that he was paying attention to another employee; that Walker-Brown willingly engaged in sexual conduct[2] with Shedd at a bowling alley after work; that Ann Walker testified that Walker-Brown was inappropriate at work on many occasions; that Ann Walker claimed Walker-Brown made crude and offensive comments on a "nightly basis," including statements concerning her husband's inadequacy in bed, sexual toys, and having a "cauliflower crotch;" and that Shedd claimed Walker-Brown participated in sexual conversations at least once a month. Doc. No. 44-4.

The plaintiffs have decided to bring this case in federal court, and therefore the Federal Rules of Evidence apply. Federal Rule of Evidence 412(a) makes evidence "involving alleged sexual misconduct" by a victim inadmissible when it is "offered to prove that any alleged victim engaged in other sexual behavior" or is "offered to prove any

---

[2] The Employer's reference to "sexual conduct" concerns Walker-Brown's attempt to sit either next to Shedd or on Shedd's lap. *See* B.63, p. 91. Staples explained in her deposition that she saw Shedd "put his hand between [Walker-Brown's]--his hand between her crotch and grab, more or less the grab." *Id.* Staples explained that, Walker-Brown "sat down, and as [Shedd] did that, [Walker-Brown] just jumped up, and it was, like, 'Whoa.'" *Id.*

alleged victim's sexual predisposition." Fed.R.Evid. 412(a). Rule 412(b)(2), which provides an exception to Rule 412(a), states:

> In a civil case, evidence offered to prove the sexual behavior or sexual predisposition of any alleged victim is admissible if it is otherwise admissible under these rules and its probative value substantially outweighs the danger of harm to any victim and of unfair prejudice to any party. Evidence of an alleged victim's reputation is admissible only if it has been placed in controversy by the alleged victim.

Fed.R.Evid. 412(b)(2). In this case, Walker-Brown is asking the court to disregard some of her conduct, which may otherwise be probative of welcomeness[3] because it involves alleged sexual misconduct. As a result, the court must determine (1) whether the evidence is "otherwise admissible under these rules and (2) [whether] its probative value substantially outweighs the danger of harm to any victim and of unfair prejudice to any party." Fed.R.Evid. 412(b)(2).

The plaintiffs argue that the evidence is inadmissible under Federal Rules of Evidence 401, 402, and 403. Rule 401 defines relevant evidence (*see* Fed.R.Evid. 401), and Rule 402 explains that, generally, only relevant information is admissible. Fed.R.Evid. 402. The evidence plaintiffs seek to exclude is clearly relevant as it directly relates to whether an alleged harasser's conduct was welcome. However, Rule 403 allows the court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice...." Although one can argue that any evidence contrary to one's own position is prejudicial, Rule 403 requires that the evidence be *unfairly* prejudicial in order to be found inadmissible. The alleged behavior at issue occurred in

---

[3] The Eighth Circuit Court of appeals has found that "evidence of an alleged victim's particular behavior in the workplace may be probative of welcomeness." *Wilson v. City of Des Moines*, 442 F.3d 637, 643 (8th Cir. 2006) (citations omitted).

a public place and was directly put at issue by the plaintiffs' lawsuit. In addition, the evidence has significant probative value due to the court's duty on summary judgment to decide whether there is a genuine issue of material fact concerning whether the alleged harassers' behavior was welcome. The court finds that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice and is not inadmissible under Rule 403. Therefore, the court finds that the evidence is otherwise admissible under the Federal Rules of Evidence.

The court also finds that the probative value of the evidence substantially outweighs the danger of harm to Walker-Brown. The court's ability to consider the plaintiff's receptivity to an alleged harasser's conduct is unquestionably important.[4] It is true that a plaintiff will often be harmed, just as she will be prejudiced, by evidence that supports a position contrary to hers. However, the court is mindful of the aim of Rule 412, which is "to safeguard the alleged victim against invasion of privacy, potential embarrassment and sexual stereotyping that is associated with public disclosure of intimate sexual details." *Wilson*, 442 F.3d at 643 (quoting Fed.R.Evid. 412 advisory committee's notes). Some of the allegations at issue concern behavior that occurred in public. The other allegations contain information that might be considered private, or even irrelevant, had it not been voluntarily disclosed to a co-worker at the Employer's workplace, during the period of time put at issue by the plaintiffs. The court finds that the inclusion of the information at issue in this motion to strike, though potentially harmful to Walker-Brown, is not

---

[4] The plaintiffs, in asserting a claim of hostile work environment, must show that they were subject to unwelcome harassment. *See*, e.g., *Nitsche v. CEO of Osage Valley Elec. Co-op.*, 446 F.3d 841, 845 (8th Cir. 2006). )). "In determining whether conduct is "unwelcome," [courts] should consider whether the plaintiff indicated, by her conduct, that the alleged harassment was unwelcome." *Hocevar v. Purdue Frederick Co.*, 223 F.3d 721, 728-29 (8th Cir. 2000).

impermissible because the probative value outweighs the danger of harm to her. Therefore, plaintiffs' Motion to Strike Paragraphs 33-37 of Defendant's Statement of Facts for Violation of Iowa Code § 668.1, Doc. No. 48, is **denied**.

### C.  Sexual Discrimination

#### 1.  Arguments of the parties

##### a.  The Employer's initial arguments

The Employer, in its motion, claims that the plaintiffs cannot prove a prima facie case of sexual discrimination because the plaintiffs were not meeting the Employer's legitimate expectations for workplace conduct.  The Employer also asserts that, even if the plaintiffs were able to prove their prima facie case, it can assert a legitimate, non-discriminatory reason for its actions, which would require the plaintiffs to prove pretext.

The Employer alleges legitimate, nondiscriminatory reasons for its actions against both Staples and Walker-Brown.  First, the Employer alleges that Staples said that she would like to "choke that laugh" in response to hearing co-worker Ann Walker's laugh. Second, Walker-Brown is alleged to have said that she would like to cut up Ann Walker and mail her.  The Employer notes that it has a policy against workplace violence—that it will not be tolerated—and that the Employer suspended Staples and Walker-Brown consistent with this policy.

The Employer also claims that, because it has offered a legitimate explanation for its discipline of Staples and Walker-Brown, the plaintiffs must show that the Employer's asserted explanation is pretext.  In addition, the Employer claims that when plaintiffs were accused of threatening to kill co-workers, Staples had already received warnings under the progressive disciplinary system.

### b.    The plaintiffs' response

Plaintiffs claim that all of the Employer's disciplinary actions were taken against them in retaliation for complaining about Shedd and Allen's behavior.  Plaintiffs contest whether the alleged misconduct and workplace violence occurred, and therefore, claim that the Employer's assertion that they were not meeting legitimate workplace expectations is based on a credibility determination not left to this court.

### c.    The Employer's reply

The Employer claims that the plaintiffs, in their response to whether they were meeting the legitimate expectations of their employer, did not address the issue of whether the Employer honestly believed plaintiffs had violated company policy.  According to the Employer, this is what is at issue, not whether the plaintiffs actually made threats of physical violence.  The Employer argues that no credibility determination is necessary to assess whether the Employer received the reports of threats and that the threats were in violation of company policy.  The Employer also claims that plaintiffs do not even address whether the plaintiffs have evidence that they were disciplined due to their gender but only claim that it was due to retaliation.

### 2.    Analysis of the Sexual Discrimination Claim

In the absence of direct evidence of sexual discrimination—and no party contends that there is any direct evidence here—the plaintiff's claim is analyzed under the familiar *McDonnell Douglas* burden-shifting analysis.  *See*, e.g., *Wells v. SIOUX CITY, IOWA Mgmt., L.P.*, 469 F.3d 697, 700 (8th Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  The first step in that analysis requires the plaintiffs to establish a prima facie case of sexual discrimination; the second step requires the employer to produce a legitimate, non-discriminatory reason for its conduct; and the final step requires the plaintiffs to produce sufficient evidence to rebut the employer's legitimate,

non-discriminatory reason, which the plaintiff may do by showing that the employer's proffered reason is not only not the real reason, but is a pretext for sexual discrimination. *Id.* at 700-01. The court will consider the viability of the plaintiffs' sexual discrimination claims through each step in this analysis.

### a. The plaintiffs' prima facie case

A prima facie case of sex discrimination requires each plaintiff to prove the following:

> (1) she was a member of a protected class; (2) she was meeting the employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated differently.

*Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006). The final element of a prima facie case can also be met "if the employee provides 'some other evidence that would give rise to an inference of unlawful discrimination.'" *Turner v. Gonzales*, 421 F.3d 688, 694 (8th Cir. 2005) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003)). The Employer does not contest that the plaintiffs have established the first and third[5] elements of their prima facie case. As a result, the court will only discuss the second and fourth elements.

### i. The plaintiffs' ability to meet the Employer's legitimate job expectations.

The Employer claims in its brief that the plaintiffs "engaged in conduct that directly violates the Employer's policy against workplace violence." Doc. No. 44-2. However, the Employer does not seem to dispute that the plaintiffs were able to meet the Employer's

---

[5] Even though the Employer does not dispute that Walker-Brown was subject to an adverse employment action when she was suspended for allegedly threatening to kill a co-worker, it disputes that Walker-Brown was constructively discharged. *See* Doc. No. 44-3, fn 2.

legitimate job expectations—the Employer does not appear to dispute that the plaintiffs could complete the tasks required by their jobs. Instead, the employer alleges that the plaintiffs participated in conduct for which they were disciplined.[6] Although a plaintiff's inability to perform his or her job may also provide an employer with a non-discriminatory rational for discipline, the two are not synonymous requirements. *See Twymon*, 462 F.3d at 935. The court will consider the Employer's arguments in this regard when the court considers whether the Employer asserted a legitimate, nondiscriminatory reason for disciplining the plaintiffs.

> *ii.* ***Whether similarly situated employees were treated differently***. The plaintiffs, in trying to establish this element of their prima facie case, assert that they were disciplined more severely than their male co-workers. The Eighth Circuit Court of Appeals has explained, in relation to this element, that:

> [f]or an employee to prove a discriminatory discharge claim, he or she must show that similarly situated employees were "involved in or accused of the same or similar conduct and [were] disciplined in different ways."

*Green v. Franklin Nat. Bank of Minneapolis*, 459 F.3d 903, 913 (8th Cir. 2006) (citations omitted). The court has also required that a plaintiff "show some causal link between the differential treatment and her adverse employment action." *Id*.

---

[6] In *Twymon*, the Eighth Circuit Court of Appeals assumed that the plaintiff had established her prima facie case even though it subsequently found that the defendant had "articulated a legitimate, non-discriminatory rationale for [the plaintiff's] termination: gross violation of the company's computer policy." *Twymon*, 462 F.3d at 935. If violation of a company policy was equated to a failure to meet the employer's legitimate job expectations, the court would not have assumed that plaintiff had established her prima facie case.

The Employer admits that Allen and Walker-Brown were similarly situated in that both were involved in incidents involving physical contact: Allen was accused of making physical contact with Staples, and Walker-Brown was accused of making physical contact with Allen. The Employer claims that both incidents were dealt with in the same way because they both resulted in a warning. However, the Employer admits that Allen's warning was verbal while Walker-Brown's was in writing. The Employer tries to downplay this distinction, but in the very next sentence of its brief, it emphasizes Allen's lack of a prior disciplinary history in distinguishing Allen from Walker-Brown. According to the plaintiffs, Allen's physical contact also involved a threat.[7] The decision to punish Walker-Brown more severely than Allen, especially considering Allen's behavior was potentially more reprehensible, supports the plaintiffs' claim of disparate treatment.

The plaintiffs have also provided evidence in the record that one or more of Staples's suspensions were due to gossiping or spreading rumors. One of Staples's written disciplinary reports states the following:

> On 4-12-06 [Mary] Patty Staples was communicating rumors about other employee's (sic) to another employee on company property causing negative work environment and disrupting normal production. Patty was also communicated to 4 Apr 06 regarding about not being involved in the spreading of rumors by Human Resources and it would not be tolerated. Patty any further corrective action could lead up to your termination of employment with Goodrich.

A.12. Again, Allen was accused of taking part in similar behavior. Allen, after receiving personal information about Staples, allegedly repeated that information to co-workers. At

---

[7] In her deposition, Staples claims that Allen "squeezed real hard, and he said, 'You better not be green sheeting my parts or I'll knock you out.'" A.67, p. 34.

Connie Pudenz's[8] deposition, she provided the following explanation for the Employer's failure to punish Allen for this gossip-like behavior:

> We're giving him a break because [Mary] Patty [Staples] set the situation up and discussed something she felt was very personal in front of somebody, and then, you know, became upset when they told someone.

B.96, p. 166. The plaintiffs dispute whether Staples set up the situation, and there is evidence supporting the plaintiffs' contention.[9] In addition, some of Staples's alleged gossip is arguably a result of a situation that was set up by the subjects of the alleged gossip.[10]

The Employer also claims Staples's termination was due to her past disciplinary history. It is undisputed that Staples would not have been terminated because of the "alleged threats" in and of themselves. Instead, the Employer claims that Staples was terminated because she had no fewer than three suspensions. However, if the suspensions were issued in a discriminatory fashion, as the plaintiffs have alleged, then Staples's

---

[8] Connie Pudenz's title is Human Resource Generalist.

[9] The parties do not dispute that Allen was privy to some of Staples's personal information but do dispute how Allen obtained the information. According to Roy Alford, Staples's supervisor at the time, Staples disclosed the information after she interrupted a conversation between Alford and Allen in Alford's office. However, at Pudenz's deposition, she admits that Staples's account of what occurred did not involve an interruption and that Staples had told Pudenz that Alford disclosed the information to Allen in the kitchen area. *See* B.96, p. 166.

[10] Staples's alleged gossip concerned statements acknowledging the possibility of an affair between Anne Walker and Jeff Shedd. Staples claimed, in her deposition, that Greg Allen had seen them kissing in the parking lot. Shedd explained at his deposition that he may have kissed Annie Jackson but thinks that it would have been "in the bar and out of the bar, I think, but I don't think there was a vehicle involved." B.41, p. 26.

termination might also be found to have been tainted by discrimination. The court finds plaintiffs have met their burden of proving this element.

### b. *The Employer's asserted legitimate, nondiscriminatory rationale*

Since the plaintiffs have established a prima facie case of discrimination, the Employer must articulate a legitimate, non-discriminatory rationale for its adverse employment actions. *See Twymon*, 462 F.3d at 934 (quoting *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 810 (8th Cir.2005)("If a prima facie case is established, a 'burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for'" taking the adverse employment action.).

The Employer's asserted legitimate, nondiscriminatory rationale for disciplining both plaintiffs is based on each allegedly threatening a co-worker. The Employer claims that it suspended Staples, and later terminated her, because she threatened a co-worker, Ann Walker. Staples is alleged to have said to Lisa Boell and Nancy Reiling, about Ann Walker's laugh, "I would like to choke that laugh." B.82, 52. Staples was allegedly terminated, however, because she was suspended for a third time, which required her termination under the Employer's progressive discipline policy.

The Employer claims that it also suspended Walker-Brown after she threatened a co-worker. Walker-Brown allegedly told her supervisor that "she was very upset and that she could kill Ann [Walker], and that she would like to cut her up and send her body parts to different states." A.49.

The defendant only has a burden of production at this stage of the *McDonnell Douglas* burden shifting test, not the burden of proof, and the court finds that the Employer has met this lower burden. Therefore, the court will consider whether the plaintiffs have established that there is a genuine issue of material fact concerning whether the asserted reasons are pretext for an impermissible motive.

### c.    *Pretext and discriminatory animus*

Once the defendant has established a legitimate, nondiscriminatory reason for the adverse employment action, the court must determine whether the plaintiffs have proven that the stated reason was pretext. *Twymon*, 462 F.3d at 935. Because the plaintiffs were allegedly disciplined for different events, each plaintiff's discipline will be evaluated separately.

### i.    *Staples's suspension and termination*.

Again, Staples is alleged to have said, to Lisa Boell and Nancy Reiling, about Ann Walker's laugh, "I would like to choke that laugh." B.82, 52. These two individuals, Lisa Boell and Nancy Reiling, informed Pudenz of this comment. Staples was suspended, and the Employer claims that Staples's termination resulted from the suspension, consistent with its progressive discipline policy.

Staples claims that the Employer's asserted reason for her suspension is pretext. The summary judgment record shows that Pudenz considered Staples's alleged comment a threat "[b]ecause when she [Lisa Boell and/or Nancy Reiling] came forward with it, that's how she expressed it, that she thought it was threatening behavior to a coworker." A.83, p. 55. However, Ann Walker, the alleged victim of the threat, did not complain because she did not hear it. *Id*. In other words, Pudenz suspended Staples because of an alleged comment that Staples made, when the victim of the statement did not complain, because in the complaining party's judgment it was a threatening statement. In fact, the Employer asserts that it suspended Staples because of this statement, without talking to Staples about whether she made the statement, without asking Staples about her intent behind the statement, and without considering whether the complaining parties had ulterior

motives to complain about the statement.[11]  At her deposition, Pudenz was asked why she did not talk to Staples about the comment.  Pudenz explained, "[i]f my memory serves me... I don't remember."  B.82, p. 53.  Staples's suspension was only based on the Lisa Boell and Nancy Reiling statements.

The court has in mind the Eighth Circuit Court of Appeals's advice in *Kiel*, that "it is not the prerogative of the courts or a jury to sit in judgment of employers' management decisions."  *Kiel*, 169 F.3d at 1136.  However, the court does not look at this guidance as precluding the court's consideration of whether an employer's management decisions are exercised consistently and whether a lack of consistency could provide a genuine issue of material fact for a jury.  The suspension was based on Staples making an alleged threat, which was reported by two parties who were not the recipient of the threat.  The recipient of the alleged threat was not present and the statement concerned only choking the co-worker's laugh.  In addition, no investigation was performed outside of passively receiving the report of the threat.  These circumstances might ordinarily be considered an employer exercising its prerogative to strictly enforce a no threat policy, but the summary judgment record concretely establishes that this employer followed no such policy in dealing with the plaintiffs' complaints, and therefore it provides a jury with a sufficient basis for finding that the discipline was pretextual.  This final suspension, because of the Employer's

---

[11]  Pudenz's deposition provides evidence that Lisa Boell and possibly other co-workers may have been upset with the plaintiffs for Jeff Shedd's termination or in relation to allegations that the plaintiffs claimed that they could cause the termination of other co-workers.  See B.79, p. 25.

progressive disciplinary system, resulted in Staples's termination.[12]   The Employer is not

entitled to summary judgment on Staples's sexual discrimination claim.

      ***ii.***     ***Walker-Brown's suspension.***  The Employer alleges that Walker-Brown's

most recent suspension was due to comments she made to Roy Alford, Walker-Brown's

supervisor.  In a "Memorandum for Record," produced in the summary judgment record,

Alford explains Walker-Brown's alleged threat:

> July 16, 2006 approximately 2315hrs.   My employees
> surprised me with a birthday cake in the break room.  While
> greeting and thanking them for their remembrance, I witnessed
> an exchange between Ann Walker and Kathy Walker[-Brown].
> Kathy was speaking to me about not getting an opportunity to
> sign the B-day card that went around last week.  I stated that
> that was OK, the card went around when she was absent, she
> then stated again that it would have been nice to get the card
> anyhow, but this time it was said in a sharp tone and loud
> enough for Ann to hear, who was about three feet away.  Ann,
> in a direct tone, said the card was passed around to every one.
> After the exchange as Kathy and Patty were walking away, I
> overheard a bit of a negative discussion regarding the
> conversation in the break room.  I asked Kathy if everything
> was alright.  She stated to me that it was alright because if she
> saw her (Ann) in public she would take care of it and the
> company would have nothing to do with it.  Kathy then told
> me that she was very upset and that she could kill Ann, and
> that she would like to cut her up and send her body parts to
> different states.  She also stated that it took every bit of control
> she had not to punch her in her face when we all were in the
> break room.  I told her to make sure her actions were loving

---

[12]   Although the court also recognizes that the timing of Staples's actual termination
is suspicious, considering nothing changed between the time she received her suspension
and her termination, the court does not find it necessary to also address this additional
potential issue of material fact concerning Staples's actual suspension.

> and kind and she said she has no love. She began to retell the
> original story about the break room, in her own perspective,
> about how the verbal friction started and she stated that she
> couldn't remember who she was talking to when it happened.
> Her perspective was clouded, as she didn't remember that the
> person she was conversing with was ME, and that I had
> witnessed everything.

A.49. Pudenz claims that Walker-Brown's suspension was due to this incident. B.93, p. 145.

Walker-Brown does not point the court toward any basis for finding that her suspension was pretextual and the court is unable to find any support for such a claim in the record. Instead, Walker-Brown claims that her suspension was due to the Employer retaliating against her for filing an Iowa Civil Rights Commission (ICRC) complaint—this claim will be addressed below. Staples's final suspension, leading to her termination, was due to reports made by co-workers and such action was inconsistent with how the Employer had handled the plaintiffs' more serious complaints. However, in Walker-Brown's case, she was suspended due to threats that were directly witnessed by a supervisor. Instead of the low-level employees' complaints as in Staples's case, the Employer suspended Walker-Brown based on a supervisor's recitation of his first-hand account of an employee's grisly explanation of what she wanted to do to a co-worker. Without regard to the severity of the behavior, the plaintiffs have not shown even one instance of a supervisor actually witnessing threatening behavior and failing to act on it. Walker-Brown denies making this threat, but she does not provide any evidence showing that the Employer's actions were pretext for sexual discrimination. Therefore, the Employer is entitled to summary judgment on Walker-Brown's sexual discrimination claim.

### D. Sexual Harassment

#### 1. Arguments of the parties

##### a. The Employer's initial arguments

The Employer claims that the plaintiffs cannot carry their burden of proving a co-worker hostile environment claim because they can only prove the first element of their case, that the plaintiffs are female. The Employer claims that plaintiffs are unable to generate a genuine issue of material fact concerning the second element, that the alleged conduct was unwelcome, because Walker-Brown allegedly engaged in the same conduct as her alleged harassers. In addition to disputing whether the plaintiffs can prove the third and fourth elements of plaintiffs' prima facie case, the Employer claims that it took prompt remedial action by terminating Shedd and demoting Allen.

##### b. The plaintiffs' response

The plaintiffs claim that they can prove a case of co-worker hostile environment sexual harassment. The plaintiffs recite their alleged harassers' behavior and claim that the behavior is sufficiently severe given precedent. However, they also object to the Employer's use of evidence related to plaintiffs' "sexual predisposition." Plaintiffs filed their Motion to Strike Paragraphs 33-37 of Defendant's Statement of Facts for Violation of IA Code § 668.15, which was dealt with above.

##### c. The Employer's reply

The Employer, in its reply, insists that there are no material facts at issue. First, the Employer claims that plaintiffs admit that Walker-Brown made sexual comments in the workplace and engaged in conduct with her harasser, Shedd, which precludes her from claiming Shedd's actions were unwelcome. Second, the Employer claims that the alleged conduct was not severe and pervasive because the harassers' alleged comments and actions

were limited and sporadic. Third, the Employer claims that Shedd's termination and Allen's demotion were sufficient actions in response to the harassment.

### 2.    *Hostile Environment Analysis*

### a.    *Elements of the claim*

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). As the Eighth Circuit Court of Appeals has explained, "[D]iscrimination based on sex that creates a hostile or abusive work environment violates Title VII." *Nitsche v. CEO of Osage Valley Elec. Co-op.*, 446 F.3d 841, 845 (8th Cir. 2006) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993), and *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996)).

The elements of a claim of hostile environment sexual harassment differ somewhat, depending upon whether the alleged harasser is a co-worker or a supervisor. *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 850 (8th Cir. 2005). To prove such a claim based on harassment by a co-worker, the plaintiff must prove the following: (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on sex; (4) that the harassment affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take proper remedial action. *See*, e.g., *Nitsche*, 446 F.3d at 845; *McCown v. St. John's Health System*, 349 F.3d 540, 542 (8th Cir. 2003).

When the harassment is by a supervisor, however, the plaintiff must prove the first four elements listed above, and if she also proves that the harassment resulted in a tangible employment action, then the employer is vicariously liable for the supervisor's harassment. *Gordon v. Shafer Contracting Co., Inc.*, 469 F.3d 1191, 1194-95 (8th Cir. 2006) (describing the first four elements as the "common" elements for supervisor and co-worker

harassment claims); *Cheshewalla*, 415 F.3d at 850. If she does not prove that the supervisor's harassment resulted in a tangible employment action then the employer may escape vicarious liability by proving the following elements of the *Ellerth/Faragher* affirmative defense: (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *See Gordon*, 469 F.3d at 1195 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. Boca Raton*, 524 U.S. 775, 807 (1998)); *Cottrill v. MFA, Inc.*, 443 F.3d 629, 634 n.2 (8th Cir. 2006); *Cheshewalla*, 415 F.3d at 850-51. The Eighth Circuit Court of Appeals has found that:

> to be considered a supervisor, "the alleged harasser must have had the power (not necessarily exercised) to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties."

*Cheshewalla*, 415 F.3d at 850-851 (quoting *Joens v. John Morrell & Co.*, 354 F.3d 938, 940 (8th Cir. 2004)).

In this case, plaintiffs complain of harassment by Greg Allen and Jeff Shedd. In its brief, the Employer claims that "it is undisputed that neither Allen nor Shedd supervised Staples or Walker-Brown." Doc. No. 44-3, fn3. The plaintiffs do not affirmatively allege that either Allen or Shedd were supervisory employees (*see* Doc. 49-2), seem to admit that Shedd was not a supervisor (*see* Doc. No. 50-2, ¶ 25), and do not clearly admit or deny whether they believe Allen was a supervisor. *See* Doc. No. 50-2, ¶ 27.

The summary judgment record shows that both Allen and Shedd filled in for the plaintiffs' supervisor, Eric Boell, on multiple occasions. *See* A.61-62, pp. 16-19. Allen also held a "lead man" position for a period of time. A.61, pp. 16-17. A "lead man,"

according to Staples's deposition, "helps everybody with whatever, whether it's finding bits, parts, help." A.61, p. 16. Although Allen and Shedd assumed duties that entailed some authority over the plaintiffs, these temporary instances of authority did not rise to the level of supervisor. However, had the summary judgment record provided evidence that Allen or Shedd used their status as fill-in supervisors to allegedly harass the plaintiffs, or allegedly harassed the plaintiffs while filling in as supervisors, the court may have reached a different conclusion. *See Williams v. Missouri Depart. of Mental Health*, 407 F.3d 972 (8th Cir. 2005) (applied supervisor framework to a fact pattern involving a temporary supervisor). Because the court finds that Allen and Shedd are the plaintiffs' co-workers, the co-worker hostile work environment framework will be applied to this case. Under the co-worker framework, the Employer concedes only that the plaintiffs can establish the first element, that they are female.

         ***i.    The   "Unwelcomeness"   of   the   Employer's   conduct***. "Unwelcomeness" of the alleged sexual harassment is the second element of a sexual harassment claim. *See Nitsche*, 446 F.3d at 845. Indeed, the "unwelcomeness" of the alleged sexual harassment is "'[t]he gravamen of any sexual harassment claim.'" *Wilson v. City of Des Moines*, 442 F.3d 637, 643 (8th Cir. 2006) (quoting *Meritor Savs. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986)). "In determining whether conduct is 'unwelcome,' [courts] should consider whether the plaintiff indicated, by her conduct, that the alleged harassment was unwelcome." *Hocevar v. Purdue Frederick Co.*, 223 F.3d 721, 728-29 (8th Cir. 2000). "A plaintiff cannot create a genuine issue of material fact with regard to unwelcome behavior when she engages in the conduct complained about." *Id.* at 737. Whether the allegedly harassing conduct was "unwelcome" is generally a question of fact for the jury, however, because it "turns largely on credibility determinations." *Id.* at 729.

The Employer claims that "the record is replete with evidence that Walker-Brown freely engaged in inappropriate banter with co-workers and once sat on Shedd's lap and allowed him to touch her crotch." Doc. No. 44-3. As an initial matter, the court distinguishes between the conversations involving sexual innuendo and employee propositions, requests, and actions. The conversations containing sexual innuendo, or references, are probative regarding the totality of the circumstances test and whether the Employer was put on notice of the sexually charged atmosphere at its facility, but it would not likely be a basis for employer liability, without more. *See Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958, 966-967 (8th Cir. 1999). The fact that the plaintiffs may have taken part in the conversations could further limit their argument for employer liability, had that been the only ground for their claim. *See Id.* at 966. However, their participation in these conversations does not provide their co-workers with a free pass, or free passes, to proposition the plaintiffs to have sexual relations, request to see their breasts, and bump up against them or corner them before grabbing them—all of these actions were alleged by the plaintiffs. There is no evidence in the summary judgment record that either plaintiff propositioned co-workers for sex, requested that other co-workers take actions that would expose the co-worker's private parts, or physically act in such a way to sexually intimidate another co-worker. There is also little evidence that the plaintiffs were receptive to this behavior. Instead, the plaintiffs allege that they complained about the behavior. Pudenz explained, in her deposition, that as far back as November of 2005 Staples had complained

about Allen touching her,[13] which supports the plaintiffs' claim that they were not interested in such contact.

There is evidence implying, as the Employer stresses, that Walker-Brown intended to sit on Shedd's lap or next to Shedd at a bowling alley. Doc. No. 50-2, ¶ 34. In fact, this evidence was provided by the plaintiffs in Staples's deposition. B.63 pp. 91. However, Staples's explanation of the event in her deposition, in response to questions regarding Shedd's request for Staples to sit on his lap, makes the circumstances surrounding the incident a bit unclear:

> I seen him pull the same thing on Kathy Walker[-Brown], and he put his hand between her– his hand between her crotch and grab, more or less the grab.

*Id*. After that, Staples saw Walker-Brown jump up and walk away. *Id*. Despite the plaintiffs' alleged participation in some sexually charged discussions and Walker-Brown's incident at the bowling alley, the court finds that the plaintiffs have generated a genuine issue of material fact concerning whether Shedd and Allen's alleged harassing conduct was unwelcome.

> ***ii.*** ***Harassment based on gender***. The Employer argues that "the vast majority of the incidents involved non-sexual shoving or other non-sexual physical contact"

---

[13] Pudenz, in her deposition, stated the following in response to a question about whether she thought that a certain incidence of Allen's touching Staples was welcomed by Staples:

> When I asked her about it if she felt threatened by it, she said no. I asked her if they were sexual in nature, she said no. Her comment was, "I just don't think anyone should touch anyone in the workplace."

B.81, p. 50.

and therefore the "conduct may have been offensive, but, as a mater of law, it cannot constitute harassment." Doc. 44-3. The United States Supreme Court has explained that discrimination may be considered to be based on gender if the employee would be treated "in a manner which but for that person's sex would be different." *Newport News Shipbuilding and Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 683 (1983) (quoting *Los Angeles Department of Water & Power v. Manhart*, 435 U.S. 702, 711 (1978)). The Eighth Circuit Court of Appeals has explained that:

> Same-sex harassment claims differ from those between males and females because the latter "typically involve[ ] explicit or implicit proposals of sexual activity," which create a presumption that the underlying conduct was based on sex. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). However, this presumption is applicable only if there is credible evidence to show that the alleged harasser is sexually attracted to the plaintiff. *Id.*

*McCown v. St. John's Health System*, 349 F.3d 540, 543 (8th Cir. 2003).

In this case, the alleged harassers, Shedd and Allen, appear to be heterosexual males who harassed the female plaintiffs. The summary judgment record includes, but is not limited to, the following allegations: Allen told Walker-Brown that he wanted to look at her breasts; Allen asked Walker-Brown what bra size she wore; Allen put his hands around her neck; Shedd told Walker-Brown that "[i]f you want a better job you would have to sleep higher up than Greg Allen;" Shedd told Walker-Brown that he "could fix her back problem with a time and a place;" Shedd told Walker-Brown that she should "name a time and a place, Swan Lake or anywhere;" Shedd said that he wished he had met Walker-Brown before he met his wife; Shedd told Walker-Brown that she only needed to identify a time and place to have sex with him; Shedd told Walker-Brown that he wanted to "fuck

her brains out;" Shedd said that he wanted to see Walker-Brown's breasts; Shedd cornered Walker-Brown in a supply room and touched her breasts and her crotch; Allen physically touched Staples by pushing her with his hands, shoving her with his belly, while commenting to get out of the way; Allen put Staples in a head lock and stated "he liked [Staples] in that position" when her head was about hip height; Allen threatened Staples with physical violence while putting his hands on her neck and pinching hard; Allen unzipped Staples's shirt without her permission in a sexual manner; Shedd told Staples that he "liked her on her knees;" Shedd or Allen inappropriately touched Staples at the comparator; and Allen and Shedd said to Staples something to the effect of wanting to "look at [Staples's] holes." Doc. No. 50.

Many of these allegations relate to explicit proposals for sexual activity, leading to the presumption that Shedd and Allen's conduct was based on sex. *See McCowen*, 349 F.3d at 543. The plaintiffs very likely would not have received the proposals for sexual activity and many of the other verbal and physical acts from the defendant had they been males. The court finds that the plaintiffs have generated a proper question for the jury regarding whether Shedd and Allen's alleged behavior toward the plaintiffs was based on the plaintiffs' gender.

> ###### iii.      *Harassment affecting a term, condition, or privilege of employment*.

The Eighth Circuit Court of Appeals, in *Nitsche*, provided clear guidance concerning when harassment affects a term, condition, or privilege of employment:

> "Harassment affects a term, condition, or privilege of employment if it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 840 (8th Cir.1998) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). [A complainant] must clear a high threshold to demonstrate actionable harm, for

"complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" obtain no remedy. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation omitted). "[A] sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id.* at 787, (citation omitted). To be actionable, the conduct complained of must be extreme in nature and not merely rude or unpleasant. *LeGrand v. Area Resources for Community and Human Services*, 394 F.3d 1098, 1101 (8th Cir. 2005) (citation omitted). Allegations of a few isolated or sporadic incidents will not suffice; rather, the plaintiff must demonstrate the alleged harassment was "so intimidating, offensive, or hostile that it poisoned the work environment." *Tuggle v. Mangan*, 348 F.3d 714, 720 (8th Cir. 2003) (quoting *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 967 (8th Cir. 1999)). Such standards are demanding, for "Title VII does not prohibit all verbal or physical harassment" and is not "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). In determining whether a work environment was sufficiently hostile or abusive, we examine the totality of the circumstances, including whether the discriminatory conduct was frequent and severe; whether it was physically threatening or humiliating, as opposed to merely an offensive utterance; and whether it unreasonably interfered with the employee's work performance. *Harris*, 510 U.S. at 23.

*Nitsche*, 446 F.3d at 846-847.

The Employer argues that the plaintiffs' complained of conduct is not severe or pervasive enough to "rise to the 'high threshold' of 'poisoning' the workplace environment." Doc. No. 44-3 (quoting *Nitsche*, 446 F.3d at 846). The Employer claims in its brief that Walker-Brown only alleges that Shedd made four comments to her of a

sexual nature and touched her inappropriately over the clothing once and that Allen made one sexual comment to her. Doc. No. 44-3. The Employer claims that Staples only alleges that Shedd made two comments about her breasts, one about her "butt" and told her that she would need to "sleep higher than the lead man," and that Allen engaged in sexually suggestive conduct on no more than four occasions between 2005 and 2006. *Id.* The Employer also argues that this conduct did not interfere with the employee's ability to perform their job—the Employer claims the plaintiffs' medical leave was due to their being upset because their co-workers were unhappy with them. *Id.*

The court recited the plaintiffs' allegations against the harassers in the previous section, but it is worth repeating the allegations, along with the claimed frequency of the behavior, when looking at its affect on the plaintiffs' working conditions. The plaintiffs allege that, beginning in September 2005, Allen told Walker-Brown that he wanted to look at her breasts and asked Walker-Brown what bra size she wore; Allen put his hands around her neck; Shedd told Walker-Brown on numerous occasions that "If you want a better job you would have to sleep higher up than Greg Allen;" that he "could fix her back problem with a time and a place;" and that Walker-Brown should "name a time and a place, Swan Lake or anywhere." In the six months prior to March 14, 2006 the plaintiffs allege that Shedd repeatedly told Walker-Brown the following: that he wished he had met her before he met his wife; that she only needed to identify a time and place to have sex with him; that Shedd wanted to "fuck her brains out;" and that Shedd wanted to see Walker-Brown's breasts. The plaintiffs allege that on one occasion, Shedd cornered Walker-Brown in a supply room and touched her breasts and her crotch. The plaintiffs allege that, starting in April 2005 and until Staples was terminated, Allen continuously touched Staples by pushing her with his hands and shoving her with his belly, while making comments such as "get out of the way." The plaintiffs also allege that Allen did the following acts: put

Staples in a head lock and stated "he liked [Staples] in that position," when her head was about hip height; threatened her with physical violence while putting his hands on her neck and pinching hard (Staples claims this behavior continued on a regular basis from Christmas 2005 until she was terminated in July 2006); in December 2005, Allen unzipped Staples's shirt without her permission in a sexual manner; and Allen told Staples that he "liked her on her knees." The plaintiffs also claim that either Shedd or Allen inappropriately touched Staples at the comparator and that Allen and Shedd said to Staples something to the effect of wanting to "look at [Staples's] holes." Doc. No. 50.

The plaintiffs also allege that they complained about this conduct. The plaintiffs claim that, at least, the following complaints were made: Walker-Brown complained to Connie Pudenz concerning Jeff Shedd; Walker-Brown reported Allen for stating that he wanted to look at her breasts in September of 2005 and followed up two weeks later with Boell; Walker-Brown complained to Boell frequently after October of 2005 about Allen; Staples reported Allen to Boell as early as November 2005. Doc. No. 50-2.

The plaintiffs' allegations must assert that the working conditions were subjectively and objectively offensive. *See Faragher*, 524 U.S. at 788. There is little doubt that the conduct was subjectively offensive. The plaintiffs both reported some of the conduct to either their supervisor, Boell, or Pundenz, which supports the idea that they were offended by the conduct and wanted to discourage it. The plaintiffs also claim that the conditions were so bad that they had to take medical leave.

Whether the conduct is objectively offensive is a harder question, and the court must look at the "totality of the circumstances," *see Nitsche*, 446 at 847 (citing *Harris*, 510 U.S. at 23), to determine whether the conduct was "so intimidating, offensive, or hostile that it poisoned the work environment." *Nitsche*, 446 F.3d at 846-847 (quoting *Tuggle*, 348 F.3d at 720). In viewing the totality of the circumstances, based on the summary judgment

record viewed in the light most favorable to the plaintiffs, the court first recognizes that the record shows that employees often had discussions at work that involved sexual innuendo. The plaintiffs further allege that Boell, their supervisor, was aware of these conversations and intentionally avoided them. In Staples's deposition, she was asked:

> Do you remember telling Mr. Boell that there was--that there were comments and talk and jokes going on during the breaks, and that you were offended by that?

B.73, p. 171. In response, Staples answered:

> Yes. He come out to break, and he said--he would grab his ears like this, put his fingers in his ears, and go, "Huh, huh, huh," walk back in, because he says, "I don't want to write anybody up, and I'm not supposed to hear this stuff."

*Id.*

The plaintiffs claim that Shedd and Allen went beyond these conversations and propositioned the plaintiffs to engage in sex acts and actually made physical contact with the plaintiffs. The summary judgment record contains evidence that Shedd and Allen repeatedly asked the plaintiffs to either engage in sex acts with them or show them their private parts. Some of the comments were communicated through sexual innuendo, such as wanting to "look at [Staple's] holes." However, the plaintiffs allege that they were subjected to repeated requests to name a "time and a place" and Walker-Brown was told by Shedd that he wanted to "fuck her brains out." One or both plaintiffs were also asked about their bras, told who they had to sleep with to get promoted and told that they were liked on their knees. A jury could reasonably find that this behavior was humiliating and possibly threatening, especially considering their supervisor, who was the person charged with enforcing the rules that protect individual workers, clearly indicated by his words and actions that he was not going to interfere with the inappropriate behavior.

The plaintiffs also allege more humiliating and threatening behavior by Allen and Shedd than these allegedly ongoing verbal attacks. This behavior includes having Allen put his hands around Walker-Brown's neck; Shedd cornering Walker-Brown in a supply room and touching her breasts and her crotch; Allen pushing Staples around with his belly; Allen putting Staples in a head lock and stating "he liked [Staples] in that position" when her head was about hip height; Allen pinching Staples; and Allen unzipping Staples shirt without her permission in a sexual manner.[14]

Of course, the court does not need to find that all of these allegations are true, but instead that there is a genuine issue for trial. The court finds that the plaintiffs have shown, by a combination of both the frequency of these alleged acts and the severity of some of these acts—along with a generally sex-charged atmosphere, which was uninhibited by supervisor Boell at this workplace—the "existence of specific facts which create a genuine issue for trial." *See Mosley*, 415 F.3d at 910 (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). As a result, the court finds that a reasonable jury could find the sexual harassment to be sufficiently severe or pervasive.

       ***iv.***    ***The Employer's knowledge and remedial actions***. The Eighth Circuit Court of Appeals has explained that "[p]roper remedial action need be only reasonably calculated to stop the harassment and remedial action that does not end the harassment can still be adequate if it is reasonably calculated to do so." *Engel v. Rapid City School Dist.*, 506 F.3d 1118, 1125 (8th Cir. 2007)(citations and internal quotations omitted). In crafting a response to alleged harassment, "the law does not require an employer to fire a sexual harasser…." *Id.* (citation omitted). In addition, "[t]hat an employer responds adequately

---

[14] The court recognizes that plaintiffs allege that Staples had a shirt on underneath the previously zipped shirt.

to an initial report of sexual harassment, however, does not discharge the employer's responsibility to respond properly to subsequent reports of offending conduct by the harasser." *Id.* The Eighth Circuit Court of Appeals has also provided several factors to help a court determine reasonableness of an employer's response, including "the amount of time that elapsed between the notice and remedial action... the options available to the employer, possibly including employee training sessions, transferring the harassers, written warnings, reprimands in personnel files, or termination... and whether or not the measures ended the harassment...." *Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir. 1999). However, "[t]he promptness and adequacy of an employer's response will often be a question of fact for the factfinder to resolve." *Id.*

In response to Allen and Shedd's alleged harassment, the Employer claims that it took the following actions: in March of 2006, the Employer began an investigation and waited only seven days to terminate Shedd (the Employer claims that neither plaintiff reported sexual conduct by Allen or Shedd before March of 2006); in response to Staples claim about Allen, Boell issued a verbal reprimand and told Allen not to touch Staples; and Boell held a meeting that reviewed the Employer's sexual harassment policy and instructed employees not to touch each other. Doc. No. 44-3. It is undisputed that Pudenz held a facility-wide meeting on April 4, 2006, with employees to discuss acceptable workplace conduct.

The summary judgment record contains evidence that discounts the Employer's actions, even Shedd's termination. As previously discussed, the plaintiffs have alleged that Boell, a supervisor, when hearing inappropriate conversations, would "grab his ears... put his fingers in his ears, and go, 'Huh, huh, huh...' [and explain] 'I don't want to write anybody up, and I'm not supposed to hear this stuff." B.73, p. 171. It is hard for a company, or a supervisor, to claim that they did not know, or should not have known,

about problems occurring in their workplace when they take this kind of approach: acknowledging that employees are acting in such a way that would warrant discipline but then literally plugging their ears and ignoring the behavior. Although the conversations themselves may not have been impermissible, the evidence supports a finding that this type of banter should have put Boell on notice to investigate whether the employees were going further than these conversations. For example, the plaintiffs claim that Shedd was acting inappropriately before March of 2006, and Boell may have discovered this alleged behavior had he not been consciously disregarding employee misconduct. This evidence may also allow a jury to find that the Employer failed to take actions that were reasonably calculated to end the harassment because any adequate response would have, at least, inhibited these conversations.

Plaintiffs also claim that, although there are no written reports of sexual harassment in the Employer's files from before March 12, 2006, reports were actually made before that date. There is evidence in the summary judgment record that could allow a jury to find that males received written discipline from the Employer on a different basis as females. As explained above, Walker-Brown and Allen were both disciplined for physical touching, but Walker-Brown received written notice while Allen did not. This evidence supports plaintiffs' contention that there may have been complaints before March 12, 2006 that were not addressed in writing. A jury may use this evidence to find the Employer was not prompt in stopping the inappropriate behavior, concerning Shedd's harassment, even though he was eventually terminated.

Similarly, Plaintiffs claim that even after Boell's meeting, Allen continued to touch Staples, Boell was informed that Allen was touching Staples, and Staples explained to Boell that Allen found his meeting to be "a joke." B.58, p. 41. Staples's deposition explains

in greater detail the plaintiffs' alleged account of how the Employer was put on notice that Boell's meeting did not work and that the harassing behavior continued:

> Q:     And Mr. Boell then reiterated what the company's policy [on sexual harassment] was during this meeting?
>
> A:     Yes.
>
> Q:     Did he indicate at all there had been a complaint?
>
> A:     No.
>
> Q:     I mean, he didn't name names, he didn't say there had been a complaint at all; correct?
>
> A:     No.
>
> Q:     But he went over the policy and reminded everybody about what the policy was; is that right?
>
> A:     Yes.
> …
> Q:     And it's your testimony that you walked out of the meeting, and Greg Allen put his arm around your shoulders?
>
> A:     Yes.
>
> Q:     Did anyone else witness this?
>
> A:     When we come out of meetings, I would say somebody was standing there.
>
> Q:     Well, I'm just trying to get a picture of where it was.
>
> A:     Yeah.  We were all coming out, you know, in a group, going back to wherever, break or wherever after that.

Q:    So it was almost immediately outside of the meeting room, it wasn't off in some corner someplace?

A:    No.  Door is here, the corner is here of the washroom, and he grabbed me before I reached the corner.

Q:    When you say grabbed you–

A:    Well, put his arm around me and said that was a joke.

Q:    Was he laughing?

A:    Oh, yeah, he was laughing hard.
…
Q:    And did you tell Mr. Boell what had happened with Mr. Allen after the meeting?

A:    Yeah, I told him the meeting did no good.

Q:    When did you tell him that?

A:    I can't come around to my--you know, he did his walk around the floor.  He kind of gets that look on his face, you know, I tried look.

Q:    So he didn't say anything to you, you volunteered and said, "I don't think the meeting did any good?"

A:    Yes, I did, and I told him why.  I told him that he had put his arm around me and told me it was a joke.

B.58-B59, pp. 40-42. The Employer did try to remedy the harassment by holding a meeting.  However, simply holding this meeting did not discharge the Employer's duty to take further actions once it was informed that the meeting did not work and that there had been additional harassing behavior.  *See Engel*, 506 F.3d at 1125.

In its briefs, the Employer also alleges that Allen's demotion was one of the actions that it took in response to harassment complaints. However, Allen stated in his deposition the following in relation to his demotion:

> I was told at first it was because I didn't have a four-year degree, because they would like their lead people to become supervisors, and at that point in time they wanted their supervisors to have a four-year college degree. Then later I found out that there was several lead people on day shift that didn't have a four-year degree, I went to the plant manager, and I asked him why my position was taken, and he told me it was because of my--the way I come off towards people. I get--oh, I don't know how to say it, how you would exactly put it. Sometimes I--when I disagree with what management, you know, was going on on the floor, the way they're going with things, you know, and I disagree, he didn't really like that, and he told me that's why I was let go of my lead man job.

B.32, pp. 50-51. Even if the Employer was demoting Allen in order to deter future harassment, the Employer's failure to tell him that his demotion was due to the harassing behavior could be grounds to find that the demotion was not reasonably calculated to stop the harassment. The court fails to see how a demotion is at all calculated to deter future harassment when the harasser is not told that the demotion was due to past harassment.

There is "sufficient evidence supporting the claimed factual dispute" of whether the Employer had knowledge of the harassment and whether its alleged remedial actions were reasonable so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. The plaintiffs allege that Shedd and Allen repeatedly harassed them. Although the Employer terminated Shedd, the plaintiffs' allegations of Shedd's history of harassment along with a supervisor who allegedly consciously disregarded inappropriate behavior provides a proper jury question. Similarly, although the Employer tried to correct Allen's behavior with a verbal warning, a meeting

46

intended for him and a demotion, these actions, in substance, were not reasonably calculated to end sexual harassment for the above reasons.  Therefore, the Employer is not entitled to summary judgment on the plaintiffs' sexual harassment claim, in light of inferences that a reasonable juror could draw from this record.

### E. Walker-Brown's Constructive Discharge

Walker-Brown claims that she was constructively discharged when she decided not to return to work after her suspension—it is undisputed that Walker-Brown could have returned to work after her suspension.  The Employer disputes that Walker-Brown was constructively discharged.  However, the Employer gives the constructive discharge issue short shrift, only addressing it in a footnote when discussing whether the plaintiffs were subject to adverse employment actions.  *See* Doc. No. 44-3, fn 2.  It appears that the Employer assumed that suspending Walker-Brown for the alleged threats was an adverse employment action that fulfilled the "adverse action" element, the third element, of Walker-Brown's sexual discrimination prima facie case.  Because the element was not in dispute, the court did not provide in-depth discussion of it.  However, even though the Employer conceded that it took an adverse employment action, the Eighth Circuit Court of Appeals has recognized that "a plaintiff has a higher evidentiary burden when seeking to establish constructive discharge than an adverse employment action." *O'Brien v. Department of Agriculture*, 532 F.3d 805, 811 (8th Cir. 2008) (citing *Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1270-71 (10th Cir. 2004).

The court also did not address constructive discharge along with the discussion of the plaintiffs' hostile environment claim.  The court found, without regard to the plaintiffs' final suspensions, that there was sufficient evidence that the conditions of the plaintiffs' employment were sufficiently affected to allow a jury to hear the claim.  With cases of

supervisor harassment, plaintiffs must prove that they suffered a tangible employment action, and often try to prove constructive discharge toward that end. *See*, e.g., *Brennan v. Famous Dave's of America, Inc.*, 507 F.3d 1139 (8th Cir. 2007); *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004). However, the court has established that this is a co-worker harassment case.

The court is aware that the issue of whether Walker-Brown's decision not to return to work amounted to a constructive discharge will likely be important, should this case proceed to trial. However, as the court has already noted, the moving party does bear "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). The court finds that the issue of whether Walker-Brown was constructively discharged was not put at issue by these summary judgment pleadings and therefore the court makes no finding concerning this claim.

## F. Retaliation

The plaintiffs claim that they were victims of retaliation for filing complaints with the Iowa Civil Rights Commission (ICRC). The Employer also seeks summary judgment on this claim.

### 1. Arguments of the parties

#### a. The Employer's initial argument

The Employer, first, acknowledges that the plaintiffs engaged in protected activity when they filed complaints with the ICRC. However, the Employer claims that after the plaintiffs filed the complaints, they engaged in intervening behavior, which culminated in the plaintiffs threatening to injure or kill a co-worker. According to the Employer, the

plaintiffs' discipline was not because of the plaintiffs' filing ICRC complaints but instead due to the threats.

### b.    The plaintiffs' response

The plaintiffs insist that the temporal proximity of the plaintiffs' ICRC complaints and the Employer's disciplinary actions establishes the requisite causation for their retaliation claim. According to the plaintiffs, Staples was also disciplined shortly after each time she complained to Boell about Allen. Additionally, the plaintiffs cite alleged inconsistencies in the Employer's employment actions as evidence of pretext.

### c.    The Employer's reply

The Employer claims that the plaintiffs were disciplined in accordance with the Employer's policies. First, Staples was terminated because she had exhausted the Employer's progressive discipline policy in having three suspensions on her record at the time she was suspended and eventually terminated. Second, Walker-Brown was only suspended, could have returned to work, and chose not to return.

### 2.    Analysis

In addition to its prohibitions on sexually discriminatory treatment and the creation of a sexually hostile work environment, Title VII prohibits an employer from retaliating against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). On the other hand, "'[f]iling a complaint [of discrimination] does not clothe [the plaintiff] with immunity for past and present inadequacies.'" *Wells v. SIOUX CITY, IOWA Mgmt., L.P.*, 469 F.3d 697, 702 (8th Cir. 2006) (quoting *Calder v. TCI Cablevision of Mo.*, 298 F.3d 723, 731 (8th Cir. 2002), with internal quotations in *Calder* omitted). When plaintiffs present "no direct evidence of

retaliation, [the court will] analyze [the] claim pursuant to the *McDonnell Douglas* burden-shifting analysis." *Thomas*, 483 F.3d at 530.

To establish a prima facie case of retaliation, the plaintiffs must demonstrate the following: (1) that they engaged in statutorily protected activity; (2) that they suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action. *Wells*, 469 F.3d at 702; *Box v. Principi*, 442 F.3d 692, 696 (8th Cir. 2006); *Cheshewalla*, 415 F.3d at 851. The Eighth Circuit Court of Appeals has also recognized a fourth element in other cases, that the plaintiff "(4) was treated differently from similarly situated males." *Hesse v. Avis Rent A Car System, Inc.*, 394 F.3d 624 (8th Cir. 2005) (quoting *Schoffstall v. Henderson*, 223 F.3d 818, 825 (8th Cir. 2000)). The Employer challenges whether the plaintiffs can generate a genuine issue of material fact concerning the third element of their prima facie case.

The Eighth Circuit Court of Appeals recently explained the requirements to prove the "causal connection" element, the third element of a prima facie case of retaliation, as follows:

> To prove a causal connection, [the plaintiff] must demonstrate the defendants' "retaliatory motive played a part in the adverse employment action." *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 896-97 (8th Cir. 2002) (quotation omitted). Evidence giving rise to an inference of retaliatory motive on the part of the employer is sufficient to establish the requisite causal link. *Id.* at 897. "An inference of a causal connection between [protected conduct] and [an adverse employment action] can be drawn from the timing of the two events, but in general more than a temporal connection is required to present a genuine factual issue on retaliation." *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1119 (8th Cir. 2006) (citation omitted).

*Thomas v. Corwin*, 483 F.3d 516, 531 (8th Cir. 2007); *see also Wells*, 469 F.3d at 702 ("'A gap in time between the protected activity and the adverse employment action weakens an inference of retaliatory motive'") (quoting *Hesse v. Avis Rent A Car Sys., Inc.*, 394 F.3d 624, 633 (8th Cir. 2005)). A lack of causal connection can also be "reinforced" by undisputed evidence of… co-worker complaints against the plaintiff. *Wells*, 469 F.3d at 702. Similarly, other intervening events between protected activity and adverse action may "erode" any causal connection suggested by temporal proximity between protected activity and adverse action. *Cheshewalla*, 415 F.3d at 852.

In this case, the plaintiffs allege that they were disciplined within weeks of complaining to the Employer, including after the filing of their ICRC complaints. However, aside from the timing of the discipline, the circumstances surrounding the adverse employment actions are different for each plaintiff. As a result, the plaintiffs' retaliation claims will be evaluated separately.

*i.* ***Staples's retaliation claim****.* Staples claims that she was disciplined shortly after each complaint she made, including her final complaint to the ICRC. First, in November of 2005, Staples complained to Boell that Allen was assaulting her, and in that same month Staples was disciplined. Second, on April 17, 2006, Staples called the Goodrich hotline to report that the harassment had not stopped, and in April of 2006 Staples was suspended. And finally, Staples filed a complaint with the ICRC—notification dated June 6, 2006 was sent to the Employer—and Staples was suspended on July 20, 2006 and later terminated. The Employer claims that the suspensions were warranted and that Staples's termination was consistent with the Employer's progressive disciplinary policy. In addition, the Employer claims that Staples and Walker-Brown were treated the same as a co-worker, Anna Martin, who had not engaged in any protected activity.

51

The Employer asserts that Staples's alleged threats should "erode any causal connection that may have been suggested by the temporal proximity of their reports and the Employer's disciplinary actions." Doc. No. 44-3 (citing *Parada* and *Kiel*). However, Staples "denies any type of threat was ever made or intended towards Ann Walker." Doc. No. 50-2. "[I]n general[,] more than a temporal connection is required to present a genuine factual issue on retaliation," *Thomas*, 483 F.3d at 531 (quoting *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1119 (8th Cir. 2006), but the court finds that Staples has met the third element of her prima facie case, showing the requisite causation, by Staples's multiple instances of discipline almost directly after her reports of inappropriate conduct. The court, therefore, turns to the Employer's asserted rationale for the disputed employment action.

Notwithstanding Staples's denial of the threat, the Employer asserts a legitimate, nondiscriminatory reason for its suspension and termination of Staples by claiming that it acted based on reports of an alleged threat. Staples is alleged to have said to Lisa Boell and Nancy Reiling, about Ann Walker's laugh, "I would like to choke that laugh." B.82, 52. These two individuals informed Pudenz of this comment. In addition, the Employer claims that the termination was warranted, after this third suspension, consistent with its progressive disciplinary policy.

The court has already explained, above, that the plaintiffs have generated a genuine issue of material fact in relation to this asserted nondiscriminatory reason for terminating Staples because of the Employer's history of disbelieving low-level employee complaints. This finding, in addition to recognizing the timing of Staples's multiple disciplinary actions, is enough to establish a genuine issue of material fact concerning whether retaliatory motives played a part in the disciplinary action. Therefore, the Employer is not entitled to summary judgment on Staples's retaliation claim.

*ii.* ***Walker-Brown's retaliation claim***.  Walker-Brown also claims that she was a victim of retaliation because the Employer suspended her shortly after she filed a complaint with the ICRC.  For generally the same reasons that were asserted for finding that Staples has successfully asserted a prima facie case of retaliation, the court assumes that Walker-Brown has successfully asserted a prima facie case of retaliation.  However, a more significant event intervened between Walker-Brown's filing of her complaint and her last suspension.  The Employer claims that Walker-Brown was suspended for threatening a co-worker when she allegedly told Alford, her supervisor, that:

> she was very upset and that she could kill Ann, and that she would like to cut her up and send her body parts to different states.  She also stated that it took every bit of control she had not to punch her in her face when we all were in the break room.

A.49.  Above, the court found that Walker-Brown did not provide sufficient evidence for a jury to find that her suspension was pretextual.  Even assuming that Walker-Brown successfully presented a prima facie case of retaliation, and recognizing that she was suspended only weeks after filing a complaint with the ICRC, the court finds that the plaintiffs have not successfully asserted a jury question concerning whether Walker-Brown was a victim of retaliatory motives.  Walker-Brown relied solely on the timing of her suspension and did not use the record to attack the Employer's asserted reason for the suspension.  Therefore, the Employer is entitled to summary judgment on Walker-Brown's retaliation claim.

## III.  CONCLUSION

THEREFORE, Plaintiffs' Motion to Strike Paragraphs 33-37 of Defendant's Statement of Facts for Violation of IA Code § 668.15 (Doc. No. 48) is **denied**, and the

defendant's Motion for Summary Judgment (Doc. No. 44-1), is granted in part and denied in part, as follows:

1.    The motion is **denied** as to Staples's claim of sexual discrimination in violation of Title VII and the ICRA and **granted** as to Walker-Brown's claim of sexual discrimination in violation of Title VII and the ICRA.

2.    The motion is **denied** as to the plaintiffs' claims of sexual harassment in violation of Title VII and the ICRA.

3.    The motion is **denied** as to Staples's claim of retaliation for complaining of sexual harassment in violation of Title VII and the ICRA and **granted** as to Walker-Brown's claim of retaliation for complaining of sexual harassment in violation of Title VII and the ICRA.

**IT IS SO ORDERED.**

**DATED** this 11th day of December, 2008.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA